[897 NYS2d 460]

CHRISTOPHER CAMPBELL et al., Respondents, v NIDIA COLON
THOMAS, Appellant, et al., Defendants.

Second Department, March 16, 2010

**APPEARANCES OF COUNSEL**

*Warren Wynshaw, P.C.;* Fishkill, for appellant.

*Christopher Campbell*, Alameda, California, respondent pro se.

**OPINION OF THE COURT**

PRUDENTI, P.J.

Elder abuse, including the financial exploitation of elderly individuals who have become mentally incapacitated, is an "often well hidden problem" (Bailly, Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.14, 2010 Pocket Part, at 36), in part because the perpetrator of such conduct is in many cases a member of the

victim's family.[1] With "the demographics promis[ing] a greater percentage of older Americans in the next thirty years" (*Matter of Astor*, 13 Misc 3d 1203[A], 2006 NY Slip Op 51677[U], *5 [Sup Ct, NY County 2006]), this problem has begun to receive increasing attention.[2] New York, however, does not yet have a statute specifically addressing a situation in which a person takes unfair advantage of an individual who clearly lacks the capacity to enter into a marriage by secretly marrying him or her for the purpose of obtaining a portion of his or her estate at the expense of his or her intended heirs. When a marriage to which one of the parties is incapable of consenting due to mental incapacity is not annulled until after the death of the nonconsenting party, a strict reading of the existing statutes requires that the other party be treated as a surviving spouse and afforded a right of election against the decedent's estate, without regard to whether the marital relationship itself came about through an exercise of overreaching or undue influence by the surviving party. On this appeal, we have occasion to consider whether the surviving party may nonetheless be denied the right of election, based on the equitable principle that a court will not permit a party to profit from his or her own wrongdoing.

In early 2000 Howard Nolan Thomas was diagnosed with terminal prostate cancer and severe dementia, which was apparently attributable to Alzheimer's disease. In February 2001 Nancy Thomas, Howard's daughter and primary caretaker, went away on a one-week vacation, and left Howard, who was then 72 years old, in the care of the defendant Nidia Colon Thomas, who was then 58 years old. Nancy and two of Howard's other children, the plaintiffs Christopher Campbell and Keith Thomas,

---

1. The results of one study indicate that in approximately 65% of substantiated cases of elder abuse, the alleged offender was an "adult child," "other family member," or "spouse/intimate partner" of the victim (National Center on Elder Abuse, *The 2004 Survey of State Adult Protective Services: Abuse of Adults 60 Years of Age and Older*, at 20 [Feb. 2006] [available at http://www.ncea.aoa.gov/Main_Site/pdf/2-14-06%20FINAL%2060+REPORT .pdf]).

2. *See e.g.* L 2004, ch 642 (adding chapter 35-A [Elder Law] to the Consolidated Laws of New York, including Elder Law § 219, which created the Elderly Abuse Education and Outreach Program); L 2008, ch 184 (enacting Executive Law § 214-c, which requires the Division of State Police to implement policies and procedures to be followed by officers who encounter elder abuse, including financial exploitation); *see generally* Jessica Baquet, Note, *Aiding Avarice: The Inequitable Results of Limited Grounds for Spousal Disqualification Under EPTL § 5-1.2*, 23 St. John's J Legal Comment 843 (2008).

later learned that, during Nancy's vacation, Nidia had married Howard, and had subsequently transferred his assets into her name. Specifically, Nidia caused the ownership of an account at the defendant Citibank worth $150,000 to be changed from Howard individually to Nidia and Howard jointly, and caused herself to be named as the sole beneficiary of Howard's account with the defendant New York City Teachers' Retirement System (hereinafter TRS), valued at $147,000.[3] Howard died in August 2001.

In November 2001 Christopher, Nancy,[4] and Keith commenced this action against Nidia in the Supreme Court, seeking, inter alia, a judgment declaring Nidia's marriage to Howard, as well as the changes to the bank account ownership and the TRS account beneficiaries, to be null and void. They contended that Howard lacked the legal capacity to enter into the marriage or execute the changes to his accounts due to his severe dementia, the effects of the medications he was taking at the time, and the progression of his cancer. The plaintiffs later amended their complaint to add causes of action alleging undue influence, conversion, and fraud.

Meanwhile, in November 2001, Christopher filed a petition for probate and letters of administration C.T.A. in the Surrogate's Court. In December 2002 Howard's will, which was dated March 24, 1976, and provided that if his first wife predeceased him, his estate was to be divided equally among his children, was admitted to probate. In January 2003 Christopher was issued letters of administration C.T.A.. In May 2003 Nidia filed a right of election, which Christopher challenged. Since the Surrogate's Court and the parties agreed that the determination of the right-of-election issue would depend upon the outcome of the dispute in the Supreme Court as to the validity of Nidia's marriage to Howard, the Surrogate's Court stayed the proceedings before it, pending the resolution of the action in the Supreme Court.

In the Supreme Court, the plaintiffs moved for summary judgment, in effect, on their causes of action seeking a judgment declaring the marriage and the changes to the bank account ownership and the TRS account beneficiaries to be null and void. They submitted, inter alia, affidavits from Christopher,

---

3. Nidia previously had been one of five beneficiaries of the TRS account, along with Christopher, Keith, Nancy, and Nancy's son, Peter Thomas.

4. Nancy died during the litigation, and the administrator of her estate, her son Peter, was substituted for her.

Nancy, and Nancy's son Peter, all of whom attested to the deterioration of Howard's mental condition.

According to Nancy, during the last three years of Howard's life, his dementia had caused him to become "paranoid, extremely forgetful, and prone to temper outbursts." As she explained it, he "experienc[ed] great confusion as to who various individuals were," and called almost all females "Nancy." Nancy asserted that, when she took Howard out of the house, he required constant monitoring, since he tended to "wander off or just remain standing in one spot with a fixed stare." As recounted by Nancy, during two different hospital stays, Howard could not feed himself, was "combative and aggressive," had to be sedated and restrained, and "would pull out his IV tubes and catheter." In her affidavit, Nancy explained that, late in 2000, Howard's primary care physician advised her that "there was nothing more that could be done for [Howard,] and it was simply a matter of time until the [prostate cancer] took its course." Nancy stated that she then conveyed this information to Nidia. According to Nancy, when Nancy found out about the marriage in March 2001 and confronted Howard about it, Howard had no awareness of the marriage, and adamantly denied that it had occurred, stating: "What are you talking about? . . . I'm not married . . . Are you crazy?" Nancy further asserted that Howard kept his will in a safe at his home, and had shown her the will in the fall of 2000, but that when Howard died, Nidia claimed that she was unable to locate the will, despite having looked in the safe. The will, however, was later produced by Nidia's attorney.

Peter averred that, despite having a close and loving bond with his grandfather throughout his childhood, he began to notice bizarre behavior on Howard's part in 1999. During his hospitalization, Howard became "belligerent and aggressive" and "threatened to kill [Peter]," and then failed to recall behaving in that manner when confronted with it later. Peter stated that, beginning in 2000, Howard "required constant supervision," and "would soil himself," requiring Nancy or Peter to clean him, "because he had lost the ability to understand that he needed to be clean." As Peter recalled, on one occasion in 2000, Howard walked out of Nancy's house, where he was living temporarily, and was found several blocks away in a confused state of mind. As further recounted by Peter, after Howard "ran away" on one or more additional occasions, Nancy decided that Howard should move back into his own home, where she would

continue to care for him, with the assistance of others, including Nidia.

In addition to describing Howard's diminished mental abilities, Christopher alleged in his affidavit that, approximately one month prior to Howard's death, Nidia sold a portion of a parcel of land owned by Howard for the sum of $90,000, and deposited the proceeds of the sale into the now-joint Citibank account. As of the date of Christopher's affidavit, the balance of the Citibank account was 54 cents.

The plaintiffs also submitted medical records as well as affidavits, one from Howard's primary care physician, who treated him for the last 13 years of his life, and one from a neurologist. Both physicians, who examined Howard in the fall of 2000, confirmed that he suffered from "severe dementia" and asserted that his condition made it inadvisable for him to be left unsupervised, "even for a minute." Both physicians recommended that Howard be placed in a nursing home, and they both would have supported an application for the appointment of a legal guardian for Howard. As explained by the physicians, and corroborated by the medical records, Howard was taking numerous prescribed medications, including psychotropic medication. As one of the physicians described it, Howard "was confused and had lost the mental capacity to provide for himself or understand his legal and financial affairs," and his mental condition continued to deteriorate after October 2000.

In addition, the plaintiffs submitted Nidia's affidavit in opposition to their prior motion for a temporary restraining order, in which Nidia made the following statement:

> "The plaintiffs claim that I tricked [Howard] into transferring the TRS Account into my name. The fact is that I did not know that he had transferred the account until three months after [his] death. He had taken the steps to make the transfer without my knowledge or my help."

In opposition to the plaintiffs' motion, and in support of her cross motion for summary judgment, in effect, declaring that the marriage and transfers of the accounts are valid, Nidia submitted her own affidavit, in which she averred that she and Howard met in 1975 after Howard's first wife died. Nidia explained that Howard was a school principal, while she was a school safety officer. According to Nidia, she and Howard had a 25-year relationship, during which Howard asked her to marry

him on four occasions: in 1979, in 1980, in 1981, and in 2001. Nidia claimed that she accepted the last proposal, even though she knew that Howard's children were against it. According to Nidia, "while [Howard] did have moments of forgetfulness, he did seem to have the requisite mental capacity to enter into the marriage vows." Nidia's relationship with Howard was not exclusive; she admitted during her deposition that she was aware during Howard's lifetime that he was dating other women. According to Christopher's affidavit, Howard jointly owned property with one such woman.

Nidia also submitted affidavits from the pastor who performed the wedding ceremony in a church and the two witnesses to the marriage, each of whom asserted that Howard "knew that he was marrying Nidia Colon." The pastor, however, testified at a deposition that, had he known about Howard's medical condition, as described by the physicians in their affidavits submitted in support of the plaintiffs' summary judgment motion, he would not have performed the wedding ceremony.

In their reply papers, the plaintiffs referred to Nidia's assertion in her prior affidavit that Howard changed the beneficiary of his retirement account without her knowledge or assistance—an assertion which Nidia repeated in her affidavit opposing the plaintiffs' motion for summary judgment. The plaintiffs pointed out that, in deposition testimony which they had also submitted in support of their motion, Nidia had admitted that the handwriting on the change-of-beneficiary form was hers, thus exposing the representations made in her affidavits as untruthful.

In an order dated October 1, 2004 the Supreme Court denied both the plaintiffs' motion and Nidia's cross motion, concluding that there were triable issues of fact as to whether Howard was capable of consenting to the marriage. On the plaintiffs' appeal, this Court concluded that the plaintiffs made a prima facie showing of their entitlement to judgment as a matter of law by demonstrating that Howard "lacked the capacity to understand his actions before his marriage, and that his mental state only diminished thereafter" (*Campbell v Thomas*, 36 AD3d 576, 576 [2007]), and that the evidence submitted by Nidia in opposition failed to raise a triable issue of fact. Accordingly, this Court reversed the Supreme Court's order insofar as appealed from, granted the plaintiffs' motion for summary judgment, and remitted the matter to the Supreme Court "for the entry of a judgment declaring null and void (1) the marriage between the

defendant Nidia Colon Thomas and the decedent Howard Nolan Thomas, (2) a change in beneficiary in Howard Nolan Thomas' Teacher's Retirement System of the City of New York account, and (3) a change in the ownership of Howard Nolan Thomas' Citibank accounts" (*id.*).

Subsequently, the Supreme Court issued an order, dated June 21, 2007, in which it made certain "findings consistent with the ruling of the Appellate Division." The Supreme Court found that Nidia had admitted that "she had the 'beneficial use' of, at a minimum, $101,997.00 from [Howard's] Citibank account," and, in effect, directed the entry of a judgment in favor of Howard's estate and against Nidia in the amount of $101,997. The order also, in effect, directed the entry of a judgment declaring that Nidia "shall have no legal rights and can claim no legal interest as a spouse of [Howard]." In addition, the order provided, among other things, that Nidia was to provide a complete accounting to the plaintiffs of all the property, money, and interests she obtained from Howard; that the TRS was to make Keith, Peter, and Christopher the sole beneficiaries of Howard's retirement account; that Citibank was to provide a complete accounting to Howard's estate of all of certain bank accounts in which Howard had an interest, and those accounts would be placed in the sole name of Howard's estate; and that Howard's estate was to be "given ownership of all property in the name of Howard N. Thomas as of October 1, 2000," and the estate was to distribute those funds to Keith, Peter, and Christopher in one-third shares.

Subsequently, Nidia moved in the Supreme Court to modify or vacate the order dated June 21, 2007. In an order dated January 31, 2008 the Supreme Court denied Nidia's motion, and Nidia now appeals.

On appeal, Nidia contends that the Supreme Court's order dated June 21, 2007 improperly directed the entry of a judgment declaring that she "shall have no legal rights and can claim no legal interest as a spouse of Howard N. Thomas." Nidia argues that, under the applicable statutes, she is considered a surviving spouse even if the marriage is subsequently annulled or voided, and is, therefore, entitled to an elective share of Howard's estate.

This Court concluded that the marriage between Nidia and Howard was null and void on the ground that Howard was "incapable of consenting to a marriage for want of understanding" (Domestic Relations Law § 7 [2]). The Domestic Relations

Law deems such a marriage to be voidable, meaning that the marriage "is void from the time its nullity is declared by a court of competent jurisdiction" (Domestic Relations Law § 7). This status is distinct from that of certain other marriages—incestuous marriages (Domestic Relations Law § 5) and bigamous marriages (Domestic Relations Law § 6)—which the law deems to be absolutely void. The distinction, however, is not that void marriages are nonexistent from the beginning, while voidable marriages are valid until declared invalid. That is the distinction between annulment and divorce. Rather, as a general rule, both void and voidable marriages are void ab initio, the difference between them being that the parties to a void marriage (and everyone else) are free to treat the marriage as a nullity without the involvement of a court, while a voidable marriage may be treated as a nullity only if a court has made the requisite pronouncement (*see Sleicher v Sleicher*, 251 NY 366, 369 [1929] ["A marriage procured by fraud is voidable, not void. Even so, annulment when decreed, puts an end to it from the beginning. It is not dissolved as upon divorce. It is effaced as if it had never been" (citations omitted)]; *Matter of Moncrief*, 235 NY 390 [1923]; *Jones v Brinsmade*, 183 NY 258 [1905]; *Matter of Skagen v New York City Employees' Retirement Sys.*, 108 Misc 2d 448, 450 [1981]; *Metcalfe v Cutler*, 52 NYS2d 71, 73 [1944], *affd* 269 App Div 655 [1945]).

In *Matter of Moncrief*, where a child's parents were married on the day after she was born, but the marriage was later annulled on the ground of duress, the Court of Appeals held that, despite a statute providing that a child whose parents are later married was deemed legitimate, the child could not be considered legitimate because her parents' marriage was a nullity. The Court explained that, at common law, whether a marriage was void or voidable, the courts were empowered to declare it void, and "[s]uch a decree rendered the marriage void from the beginning" (235 NY at 393). Although a statute enacted in 1830 provided that certain marriages were absolutely void and certain other marriages were void "from the time their nullity shall be declared by a court of competent authority," the Court concluded that the Legislature did not intend to alter the well-established rule that, when a Court annulled a voidable marriage, the marriage was void ab initio (*id.* at 394 [internal quotation marks omitted]). The Court reasoned that

> "[c]onsent is essential to the contract. No consent, no marriage. The court finds no consent. It, there-

fore, nullifies the marriage. It declares there was no marriage. From that moment the marriage is void. As we have seen a void marriage is void for all purposes from its inception. All that was meant was that no longer might husband and wife upon their own responsibility determine that they were free from the contract. Such a determination required the concurrence of the court. Only when that was obtained did the marriage become void. But when it was obtained the marriage was nullified and all the consequences of a void marriage then followed" (*id.*; *see Jones v Brinsmade*, 183 NY 258, 262 [1905] ["when a voidable marriage has been set aside by a decree of nullity, the parties are regarded as having never been married"]; *Matter of Skagen v New York City Employees' Retirement Sys.*, 108 Misc 2d at 450 [Domestic Relations Law § 7 "would be a superfluous statute if its sole meaning were to establish that the marriage is void only from the time of a declaration by the court to that effect. The same is true of the effect of any court decree. . . . Once annulled[,] . . . [a] marriage is deemed erased as if it never took place. In that respect it is very much unlike a divorce, which serves to legally terminate a marriage deemed to have validly existed"]).

In *Sleicher v Sleicher* (251 NY 366, 368 [1929]), the Court of Appeals applied the principle set forth in *Matter of Moncrief*, and concluded that, when a wife's second marriage was annulled on the ground of fraud, her right to alimony from her first husband, which, pursuant to their separation agreement, was to continue "so long as she remains unmarried," was revived. Taken to its logical conclusion, the rule applied by the Court would have required the first husband to make all alimony payments, including retroactive payments for the period during which the wife apparently was married to the second husband, since the second marriage, once annulled, had no legal existence and thus could not terminate the first husband's alimony obligation. The Court, however, limited its holding to the period following the annulment of the second marriage, reasoning that, although the first husband "must now comply with the mandate of the judgment of divorce and provide for his former wife as for one who has not remarried," this did not mean "that he must provide for her during the years when the voidable remarriage was in force and unavoided" (*id.* at 369).

The Court of Appeals later confronted the same scenario in *Gaines v Jacobsen* (308 NY 218 [1954]). In that case, the Court held that the annulment of the second marriage did not revive the first husband's support obligation, noting that, at the time of the *Sleicher* decision, a wife was not entitled to alimony upon the annulment of a marriage, which would have left the wife in that case without any means of support if the first husband's alimony obligation had not been revived. The *Gaines* Court observed that the Legislature had since enacted Civil Practice Act § 1140-a (now Domestic Relations Law § 236), which allowed for spousal maintenance upon the annulment of a marriage, and concluded that the new enactment "alters the situation before us so materially that it calls for a different result in this case" (308 NY at 223). The *Gaines* decision then proceeded to question the "doctrinal basis" of *Sleicher*, in light of the enactment of Civil Practice Act § 1140-a. The Court explained that

> "[t]he fiction that annulment effaces a marriage 'as if it had never been' is sometimes given effect and sometimes ignored, as the 'purposes of justice' are deemed to require. The courts and the legislature have, accordingly, attached to annulled marriages, for certain purposes, the same significance that a valid marriage would have, when a more desirable result is thereby achieved. Thus, although a distinction is sometimes made between void and voidable marriages, the annulled marriage has been given sufficient vitality to constitute valid consideration for a gift in contemplation of the marriage; to make a remarriage by one of the parties during its continuance bigamous; and, by statute in this state, to legitimatize any children born of the union.

> "By writing section 1140-a into the law, the legislature has chosen, without regard to whether the marriage is void or voidable, to attach to annulled marriages sufficient validity and significance to support an award of alimony, in other words, to serve, the same as any valid marriage would, as the foundation of a continuing duty to support the wife after the marriage is terminated" (308 NY at 225 [citations omitted]).

The Court of Appeals subsequently held that the *Sleicher* rule should no longer be applied to revive a support obligation upon

the annulment of a second marriage in any case, even where the remarried spouse was not statutorily entitled to support from his or her second spouse (*see Denberg v Frischman*, 17 NY2d 778 [1966], *affg* 24 AD2d 100 [1965]). Yet, despite this exception to the general rule that an annulled marriage is treated as void ab initio, and the other exceptions described in *Gaines*, it does not appear that the Court of Appeals has over-ruled *Matter of Moncrief* or the earlier decisions on which it relied.

We turn, then, to the question of whether this Court's determination that Nidia's marriage to Howard was null and void renders the marriage void ab initio for purposes of the right of election Nidia has asserted. The Domestic Relations Law provides that

> "[a]n action to annul a marriage on the ground that one of the parties thereto was a mentally ill person may be maintained at any time during the continuance of the mental illness, or, after the death of the mentally ill person in that condition, and during the life of the other party to the marriage, by any relative of the mentally ill person who has an interest to avoid the marriage" (Domestic Relations Law § 140 [c]).

The most readily apparent interest a relative of a deceased spouse is likely to have in avoiding a marriage is preventing the living spouse from sharing in the deceased spouse's estate.[5] Yet, the Estates, Powers and Trusts Law provides that a husband or wife is considered a "surviving spouse" with a right of election against the deceased spouse's estate under EPTL 5-1.1-A

> "unless it is established satisfactorily to the court having jurisdiction of the action or proceeding that:

---

5. *See Matter of Haney*, 14 AD2d 121, 125 (1961) (Civil Practice Act § 1139, the predecessor of Domestic Relations Law § 140 [e], provided for post-death cause of action for annulment where consent of deceased spouse was obtained by fraud, but not where consent of surviving spouse was obtained by fraud, because "[i]f the perpetrator of the fraud died first, there would be no opportunity for him to share in the estate of the person whom he had fraudulently induced to marry him"); *Campbell v Campbell*, 239 App Div 682, 683 (1934), *affd* 264 NY 616 (1934) ("It was the apparent purpose of the Legislature not only to protect the defrauded party by giving a right to annul, but also to protect any property rights of his or her relatives which may have been affected. If this were not so, it is difficult to comprehend why a relative of a defrauded party after his or her death, and 'during the life-time of the other party,' is permitted to bring an action for an annulment").

(1) A final decree or judgment of divorce, of annulment or declaring the nullity of a marriage . . . was in effect when the deceased spouse died [or that] (2) The marriage was void as incestuous under section five of the domestic relations law, bigamous under section six thereof, or a prohibited remarriage under section eight thereof [or that certain other circumstances, not relevant in this case, existed]" (EPTL 5-1.2 [a]).

This provision appears to render the right of family members to obtain a post-death annulment largely illusory. This effect was illustrated in *Bennett v Thomas* (38 AD2d 682 [1971]), where, although the Appellate Division affirmed the denial of a motion to dismiss a complaint seeking to annul the marriage of the plaintiffs' deceased mother, the court cited EPTL 5-1.2 (a) and pointed out·that "the outcome of this postdeath annulment action will not affect the defendant's right of election as a surviving spouse. His right to elect against his wife's estate became fixed and unalterable upon the wife's death" (38 AD2d at 682-683). Notwithstanding this potentially incongruous result, the language of the statute is inescapably plain. As applied in cases involving post-death annulments, EPTL 5-1.2 (a) appears to be among those statutory provisions in which, as the Court of Appeals discussed in *Gaines v Jacobsen*, the Legislature has "attached to annulled marriages, for certain purposes, the same significance that a valid marriage would have" (308 NY at 225).

In this case, the marriage was not declared a nullity until this Court issued its decision and order in January 2007, more than five years after Howard's death. Thus, under EPTL 5-1.2, Nidia technically had a legal right to an elective share as a surviving spouse.

That determination, however, does not end this Court's inquiry. The literal terms of a statute should not be rigidly applied *if to do so* " 'would be to ordain the statute as an instrument for the protection of fraud' " (*Citizens Util. Co. v American Locomotive Co.*, 11 NY2d 409, 420 [1962], quoting *Southern Cal. Enters. v D.N. & E. Walter & Co.*, 78 Cal App 2d 750, 752, 178 P2d 785, 786 [1947]). Mechanically applying EPTL 5-1.2 to honor the right of election of a surviving spouse whose very status as a spouse was procured through overreaching or undue influence would "seemingly invite[ ] a plethora of surreptitious 'deathbed marriages' as a means of obtaining one third of a

116

decedent's estate immune from challenge" (*Matter of Berk*, 20 Misc 3d 691, 697 [2008]).

██ The Supreme Court, being a court of equity as well as law (*see* NY Const, art VI, § 7 [a]; *McCain v Koch*, 70 NY2d 109, 116 [1987]), was empowered to grant relief consistent with the equitable principle that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime" (*Riggs v Palmer*, 115 NY 506, 511 [1889]; *see Matter of Covert*, 97 NY2d 68, 74 [2001]; *In re Lonergan's Estate*, 63 NYS2d 307 [1946]; *see also Barker v Kallash*, 63 NY2d 19, 25 [1984]; *Carr v Hoy*, 2 NY2d 185, 187 [1957]). Pursuant to this doctrine, which has been applied in both civil and criminal cases, the wrongdoer is deemed to have forfeited the benefit that would flow from his or her wrongdoing (*see Giles v California*, 554 US —, —, 128 S Ct 2678, 2683 [2008] [discussing common-law doctrine of "forfeiture by wrongdoing," under which a criminal defendant forfeits the right to confront witnesses by engaging in conduct designed to prevent a witness from testifying]; *Diaz v United States*, 223 US 442, 458 [1912], quoting *Falk v United States*, 15 App DC 446, 460 [1899] [" 'The question is one of broad public policy. . . . Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong' "]; *New York Mut. Life Ins. Co. v Armstrong*, 117 US 591, 600 [1886] [person who purchased life insurance policy "forfeited all rights under it when, to secure its immediate payment, he murdered the assured" (quoted in *Riggs v Palmer*, 115 NY at 512)]; *People v Sanchez*, 65 NY2d 436 [1985] [criminal defendant who deliberately leaves courtroom during trial forfeits the right to be present at trial]; *Matter of Coty, Inc. v Anchor Constr., Inc.*, 2003 NY Slip Op 50013[U], *27 [Sup Ct, NY County 2003], *affd* 7 AD3d 438 [2004] ["for example, if one party destroys evidence, wrongfully resists disclosure, intentionally absents itself, or prevents a witness from testifying, it cannot profit from its own misconduct"]).

This "fundamental equitable principle" (*Simon & Schuster, Inc. v Members of N.Y. State Crime Victims Bd.*, 502 US 105, 119 [1991], quoting *Matter of Children of Bedford v Petromelis*, 77 NY2d 713, 727 [1991]) has been invoked to deny an individual who murders a family member the right to inherit from the victim of the murder (*see Riggs v Palmer*, 115 NY at 513), the right to succeed to the survivorship interest he would have otherwise had as a joint tenant of the victim (*see Matter of Co-*

*vert*, 97 NY2d at 76), and the right to an elective share of the victim's estate (*see In re Lonergan's Estate*, 63 NYS2d 307, 308 [1946]). The rule, however, is not limited to murderers, and has been employed under a variety of circumstances, for example, to prevent a party from enforcing an illegal contract (*see Stone v Freeman*, 298 NY 268 [1948]), to preclude recovery in tort by a plaintiff whose injuries directly resulted from his or her serious violation of the law (*see Manning v Brown*, 91 NY2d 116 [1997]), to deny a wife's request to redate a judgment of divorce terminating her husband's prior marriage where the wife knew that her own marriage to the husband was bigamous (*see Martin v Martin*, 205 AD2d 506 [1994]), and to find that a landowner's commencement of construction of a shopping center did not create a vested right to the issuance of building permits, where the landowner knowingly performed the work in violation of a restrictive covenant (*see Matter of G. M. Land Corp. v Foley*, 20 AD2d 645 [1964]).

In determining whether Nidia engaged in wrongdoing from which she now seeks to profit by taking a share of Howard's estate, we begin with the decision on the prior appeal in this matter, in which this Court determined that Howard lacked the mental capacity to enter into the marriage. The record that was before the Supreme Court in this matter establishes that Nidia was aware of this lack of capacity. As Nidia well knew, Howard's dementia had advanced to the point that he often had difficulty recognizing family members, had lost the ability to understand his legal and financial affairs or even to attend to his own basic hygiene, and could not be left alone for any period of time. Nidia had also been informed that, due to the progression of his prostate cancer, Howard was not expected to live much longer. With knowledge of these facts, Nidia waited until Nancy, Howard's primary caretaker, left for a vacation, and then married Howard, without informing Nancy or any other member of Howard's family until after the fact. Nidia not only quickly arranged to have her name added to Howard's bank account, but also secretly made herself the sole beneficiary on Howard's retirement account. Nidia then attempted to cover up the latter fact by falsely stating in two affidavits that Howard made her the sole beneficiary without her knowledge or assistance, when, in fact, she herself had filled out the change-of-beneficiary form.

Taken together, the foregoing facts provide ample support for an inference that Nidia was aware of Howard's lack of capacity to consent to the marriage, and took unfair advantage of his

condition for her own pecuniary gain, at the expense of Howard's intended heirs. Thus, Nidia procured the marriage itself through overreaching and undue influence. Nidia should not be permitted to benefit from that conduct any more than should a person who engages in overreaching and undue influence by having himself or herself named in the will of a person he or she knows to be mentally incapacitated (*see Riggs v Palmer*, 115 NY at 512; *see generally Matter of Walther*, 6 NY2d 49 [1959]; *Matter of Burke*, 82 AD2d 260 [1981]). By her conduct, Nidia has forfeited any rights that would flow from the marital relationship, including the statutory right she would otherwise have to an elective share of Howard's estate.

We recognize that Nidia's conduct was not as egregious as, for example, the conduct of the defendant in *Riggs v Palmer* (115 NY 506, 509 [1889]), who, having been named in his grandfather's will, murdered his grandfather in an effort to obtain "speedy enjoyment" of his inheritance and to prevent the grandfather from excluding him from the will (*see also In re Lonergan's Estate*, 63 NYS2d 307 [1946] [surviving spouse who had murdered his wife had no right to spousal election against her estate]). Yet, while the wrongdoers in *Riggs* and *Lonergan* were already in a position to benefit from their victims' estates, in the present case, it was the wrongful conduct itself that put Nidia in a position to obtain benefits that were available by virtue of being Howard's spouse. Thus, while the measures taken by Nidia were certainly not as extreme as those taken in *Riggs* and *Lonergan*, the causal link between the wrongdoing and the benefits she sought was actually more direct in this case (*cf. McConnell v Commonwealth Pictures Corp.*, 7 NY2d 465, 471 [1960] [for recovery to be denied on the basis of wrongdoing, "[t]here must at least be a direct connection between the illegal transaction and the obligation sued upon"]). Moreover, the facts that Nidia had known Howard for 25 years, had a close relationship with him, and had been legitimately named as one of the beneficiaries of his retirement account do not diminish Nidia's culpability. If anything, those facts—which Nidia has in common with a large percentage of perpetrators of elder abuse (*see supra* footnote 1)—indicate that Nidia was in a position of trust, which she abused, and that she could not plausibly deny awareness of Howard's mental incapacity.

Thus, Nidia wrongfully altered Howard's testamentary plan in her favor, just as surely as if she had exploited his incapacity to induce him to add her to his will and bequeath her one third

of his estate. Under such circumstances, equity will intervene to prevent the unjust enrichment of the wrongdoer.

We find this result to be compelled not only by the need to protect vulnerable incapacitated individuals and their rightful heirs from overreaching and undue influence, but to protect the integrity of the courts themselves. It is "an old, old principle" that a court, "even in the absence of express statutory warrant," must not " 'allow itself to be made the instrument of wrong, no less on account of its detestation of every thing conducive to wrong than on account of that regard which it should entertain for its own character and dignity' " (*Matter of Hogan v Supreme Ct. of State of N.Y.*, 295 NY 92, 96 [1946], quoting *Baldwin v City of New York*, 42 Barb 549, 550 [1864], *affd* 45 Barb 359 [1865]; *cf. Carr v Hoy*, 2 NY2d at 187, quoting *Stone v Freeman*, 298 NY at 271 ["a party to an illegal contract cannot ask a court of law to help him carry out his illegal object" because " 'no court should be required to serve as paymaster of the wages of crime' "]). In this case, the record reveals that Nidia secretly entered into a marriage with a person whom she knew to be incapable of consenting to marriage, with the intent to collect, as a surviving spouse, a portion of his estate. A crucial step in the completion of that plan was Nidia's assertion of a right of election in the Surrogate's Court. Of course, the powers of the judiciary are not unlimited, and courts are not capable of righting or preventing every wrong. The courts, however, can, and must, prevent themselves and their processes from being affirmatively employed in the execution of a wrongful scheme.

The equitable doctrine pursuant to which we find that Nidia has forfeited her right of election does not displace legislative authority, but complements it. Our decision does not reflect an effort to avoid a result intended by the Legislature. Rather, for the following reasons, it is clear to us that the Legislature did not contemplate the circumstances presented by this case when it enacted EPTL 5-1.2.

For purposes of determining a surviving spouse's right to an elective share, the Legislature has, in general, chosen to treat marriages annulled after the death of one of the spouses as being valid until the annulment, rather than void ab initio. Thus, where there has been no pre-death annulment, EPTL 5-1.2 does not, by its terms, disqualify the surviving spouse from asserting a right of election where the deceased spouse's consent was lacking due to, e.g., fraud or want of understanding. In most cases, the statute will produce an acceptable result. In some

cases where the deceased spouse lacked the capacity to marry, the surviving spouse may have been unaware of the incapacity, and thus innocent of any wrongdoing, and it is, therefore, reasonable to permit the surviving spouse to elect against the decedent's estate. In cases of fraud or temporary incapacity, even where the surviving spouse has engaged in wrongdoing, it is possible for the deceased spouse to ratify, or condone, the marriage at any time before his or her death (*see* Domestic Relations Law § 140 [e] ["a marriage shall not be annulled . . . on the ground of fraud, if it appears that, at any time before the commencement thereof, the parties voluntarily cohabited as husband and wife, with a full knowledge of the facts constituting the fraud"]; Domestic Relations Law § 140 [c] [action to annul marriage on mental illness grounds may be "maintained by the mentally ill person at any time after restoration to a sound mind; but in that case, the marriage should not be annulled if it appears that the parties freely cohabited as husband and wife after the mentally ill person was restored to a sound mind"]; *Aghnides v Aghnides*, 308 NY 530, 533 [1955]; *Avnery v Avnery*, 50 AD2d 806, 808 [1975]). In such cases, the surviving spouse may be deemed worthy of an elective share despite his or her initial wrongdoing.

In this case, however, the marriage was wrongfully procured by Nidia, and since, as Nidia had every reason to know, Howard's mental condition would become progressively worse until his death, this was not a situation in which the marriage, though initially nonconsensual, could be ratified later by the nonconsenting spouse. Indeed, Howard's condition was such that he not only lacked any awareness that the marriage had occurred, but vehemently denied that it had when he was confronted with it. Nidia's conduct in this case—marrying Howard so close to the end of his life, with knowledge that Howard was mentally incapacitated and would never regain his mental capacity, and concealing the marriage from Howard's family— was unmistakably designed to preserve the nonconsensual marriage until Howard's death, thus ensuring that Nidia would be regarded by the law as a surviving spouse.

When it enacted EPTL 5-1.2 in 1966, the Legislature was focused on preventing an individual from disinheriting his or her spouse (*see* 3d Rep of Temp St Commn on Estates, 1964 NY Legis Doc No. 19, at 23; Jessica Baquet, Notes, *Aiding Avarice: The Inequitable Results of Limited Grounds for Spousal Disqualification Under EPTL § 5-1.2*, 23 St. John's J Legal

Comment 843, 847-857 [2008]). We are confident that the Legislature did not intend the statute to provide refuge for a person seeking to profit by means of a nonconsensual marriage. And our holding that the statutory right of election may be forfeited is limited to just such a situation, that is, where an individual, knowing that a mentally incapacitated person is incapable of consenting to a marriage, deliberately takes unfair advantage of the incapacity by marrying that person for the purpose of obtaining pecuniary benefits that become available by virtue of being that person's spouse, at the expense of that person's intended beneficiaries.

Although we exercise our equitable power to award appropriate relief in this case, we nonetheless call upon the Legislature to reexamine the relevant provisions of the EPTL and the Domestic Relations Law and to consider whether it might be appropriate to make revisions that would prevent unscrupulous individuals from wielding the law as a tool to exploit the elderly and infirm and unjustly enrich themselves at the expense of such victims and their rightful heirs.

For the foregoing reasons, we conclude that the Supreme Court, in its order dated June 21, 2007, properly directed the entry of a judgment declaring that Nidia "shall have no legal rights and can claim no legal interest as a spouse of [Howard]" (see Matter of Kaminester v Foldes, 51 AD3d 528, 529 [2008], quoting People ex rel. Doe v Beaudoin, 102 AD2d 359, 363 [1984] ["Supreme Court and Surrogate's Court have concurrent jurisdiction in matters involving a decedent's estate," and "a Supreme Court Justice is vested with inherent plenary power (NY Const, art VI, § 7) to fashion any remedy necessary for the proper administration of justice"]; Gaentner v Benkovich, 18 AD3d 424, 427-428 [2005]). Therefore, in the order appealed from, the Supreme Court properly denied that branch of Nidia's motion which was to modify or vacate that provision of the order dated June 21, 2007.

The Supreme Court also properly denied that branch of Nidia's motion which was to modify or vacate the provision of the order dated June 21, 2007, which directed that Howard's estate was to be "given ownership of all property in the name of Howard N. Thomas as of October 1, 2000," and that the estate was to distribute those funds to Keith, Peter, and Christopher in one third shares. In light of Nidia's lack of any legal right or interest as a spouse of Howard, she does not have standing to challenge the Supreme Court's directive regarding the distribution of Howard's estate.

■ There is one aspect of the order dated June 21, 2007 that requires modification. That order directed the TRS to make Keith, Peter, and Christopher the only beneficiaries of Howard's retirement account. Prior to Nidia's marriage to Howard, however, Nidia had been one of the beneficiaries of that account. Thus, the share in the account that Nidia already possessed was not a product of her wrongful conduct (*see Matter of Covert*, 97 NY2d at 74 ["we have never applied the doctrine (that one shall not profit from his or her own wrongdoing) to cause a wrongdoer's forfeiture of a vested property interest"]). Accordingly, rather than awarding the entire proceeds of the TRS account to Keith, Peter, and Christopher, the parties should be restored to the status quo ante by means of a direction to the TRS to restore the designation of the beneficiaries of the account to that which existed prior to the change made thereto in 2001. We note that any funds paid to or held by Nidia are subject to any valid claims by, and any enforcement proceedings brought by, Howard's estate.

Nidia's remaining contentions are without merit.

Accordingly, the order dated January 31, 2008 is modified, on the law, by deleting the provision thereof denying that branch of Nidia's motion which was to vacate the provision of the order dated June 21, 2007, directing the New York City Teachers' Retirement System to "recognize and make Keith Howard Thomas, Peter Thomas, and Christopher L. Campbell the sole beneficiaries under Howard N. Thomas' TRS Pension Number R-7817910 (or any other account of Howard N. Thomas) with each beneficiary receiving a 1/3 share," and substituting therefor a provision granting that branch of the motion and directing the New York City Teachers' Retirement System to restore the designation of the beneficiaries of Howard N. Thomas's Teachers' Retirement System of the City of New York account to that which existed prior to the change made thereto in 2001. We otherwise affirm the order.

MILLER, CHAMBERS and ROMÁN, JJ., concur.

Ordered that the order dated January 31, 2008 is modified, on the law, by deleting the provision thereof denying that branch of the motion of the defendant Nidia Colon Thomas which was to vacate the provision of the order dated June 21, 2007 directing the New York City Teachers' Retirement System to "recognize and make Keith Howard Thomas, Peter Thomas, and Christopher L. Campbell the sole beneficiaries under Howard N. Thomas' TRS Pension Number R-7817910 (or any other ac-

count of Howard N. Thomas) with each beneficiary receiving a ⅓ share," and substituting therefor a provision granting that branch of the motion and directing the New York City Teachers' Retirement System to restore the designation of the beneficiaries of Howard N. Thomas's Teachers' Retirement System of the City of New York account to that which existed prior to the change made thereto in 2001; as so modified, the order is affirmed, with costs to the respondent Christopher Campbell.