## ELIHU E. JACKSON Et Al. *vs*. SALLIE JACKSON.

*Marriage and Legitimacy—Proof of Marriage by General Reputa-
tion—Effect given to Marriage Valid by the lex loci Contractus—
Evidence of Law of Another State—Bill of Exceptions.*

If in order to establish legitimacy, a party endeavors to prove that the
marriage of his parents was celebrated at a particular place and by
particular ceremony, and fails to produce sufficient evidence to that
effect, he cannot then rely on general reputation and cohabitation to
establish the alleged marriage.

To the general rule that a marriage-valid according to the law of the
State where celebrated is valid everywhere, there are certain excep-
tions.

The plaintiff in this case, in order to prove her legitimacy, sought to
establish the marriage of her parents by evidence of general reputa-
tion, cohabitation and acknowledgment in Pennsylvania, where she
was born, as well as by evidence of the same elsewhere. *Held*, that
since there is no statute in Maryland declaring that a marriage of
whose existence there is no other proof than general reputation shall
be void, and as the statutory provisions concerning the solemnization
of marriages in Maryland relate to form and ceremony only, the
Courts of this State will recognize the Pennsylvania marriage as
valid if it was valid under the laws of that State.

A practising lawyer of another State is competent to testify as to the
requisites of a valid marriage in that State.

Where the point at issue was whether certain parties were married or
not, the evidence relied on to establish the marriage being general
reputation and cohabitation, and where the parties separated after
having lived together, it is not competent to ask a witness whether
he knew the general reputation of the woman *after* the separation
for chastity while she and the man were living together.

To establish a marriage by reputation, no evidence of any kind of repu-
tation but a *general* one is admissible. If a man and a woman are
generally reputed to be married, or if the contrary be generally
asserted, a general reputation one way or the other exists. But a
witness cannot be asked if there was a *divided* reputation in the com-
munity as to whether the parties were married or not.

Where the bill of exceptions fail to set forth the answer of a witness to
the question excepted to, the judgment will not be reversed, because
this Court cannot see that any injury was done to the appellant by
allowing an incompetent question to be asked.

Appeal from the Circuit Court for Wicomico County. On November 31, 1893, the Orphans' Court of Dorchester County sent to the Circuit Court of that County the following issue: " Is Sally Jackson the only lawful child of Richard Watson Jackson, intestate, deceased, whose estate is sought to be administered upon ? " and directed that upon the trial of this issue Sally Jackson should be the plaintiff. The appeal from the rulings of the Circuit Court upon the first trial of that issue is reported in 80 Md. 176.   A new trial was then awarded and the case was removed, upon defendants' suggestion, to the Circuit Court for Wicomico County.   The first, second, third, fourth ·and sixth exceptions to the evidence are stated in the opinion of the Court. The seventh and ninth exceptions were taken to the refusal of the trial Court to strike out the evidence of witnesses who, after testifying that the general reputation of R. W. Jackson and the plaintiff's mother, while they lived together in Salisbury, was that they were married, admitted on cross-examination that they had never heard many people talk about it, or only knew it as matter of rumor among a certain class of people.   In the eighth exception, the defendants offered evidence as to the reputation of plaintiff's mother for chastity, in Salisbury, after her separation from Jackson.   This was excluded by the Court because it appeared from the evidence that she had never lived in Salisbury after the separation.

The plaintiff's first prayer, after setting forth the evidence as in the first prayer on the former appeal (80 Md. 178), concluded as follows: " then the jury may infer from such facts that the said R. W. Jackson and Mary were lawfully married, and if they so find, their verdict shall be for the plaintiff, Sallie Jackson."   This prayer was granted.

The plaintiff's second prayer was the same as on the first trial.

*Plaintiff's 5th Prayer* instructed the jury, that in determining from the evidence of cohabitation, general reputation, declarations and acknowledgments of the parties

whether or not R. Watson Jackson and the plaintiff's
mother were married, they should take into consideration
the reputation of the plaintiff's mother for chastity, the
length of time they lived together and held themselves out
as man and wife; the manner and circumstances of their
coming together as man and wife, and so living the length
of time they lived apart, the declaration of them, or either
of them before and after their separation; the manner in
which they were received and treated by their respective
families and the society of the community in which they
lived during the time of their cohabitation, and all the facts
and circumstances offered in evidence, for the purpose of
enabling them to decide whether the cohabitation was
according to the proprieties of married life, or whether it
was licentious. (Granted.)

*Plaintiff's 9th Prayer* instructed the jury that there is no
legally sufficient evidence in this case of a general reputa-
tion that R. Watson Jackson and Mary Morris Jackson
were not married during the time they resided together as
man and wife. (Granted.)

And the defendants offered the following prayers, viz:

*Defendants' 1st Prayer.*—The defendants pray the Court
to instruct the jury that there is no sufficient legal evi-
dence of a valid contract of marriage between the plaintiff's
mother and R. Watson Jackson ever having been made in
the State of Maryland. (Granted.)

*Defendants' 2nd Prayer.*—That if the jury shall believe
from the evidence, that the connection between the plain-
tiff's mother and R. Watson Jackson was in its beginning
illicit or without marriage between them, the presumption
is that this connection continued to be illicit, and the bur-
den is upon the plaintiff to overcome that presumption by
distinct proof of marriage, and their marriage cannot be
presumed from cohabitation, general reputation and ac-
knowledgments of said parties, and unless they shall find
there was a subsequent valid marriage between the said
parties, then their verdict must be for the defendants, even

if they shall believe the plaintiff is the child of said R.
Watson Jackson. (Rejected.)

*Defendants' 3rd Prayer.*—That if the jury shall believe
from the evidence that the plaintiff undertook to prove that
a valid marriage took place between her mother and R.
Watson Jackson, in Chester, Pennsylvania, at any time
during the year 1872, and at no other place; and if they
shall believe that the evidence is insufficient to establish
such marriage at the time and place offered by them, then
the jury cannot find from cohabitation, general reputation
of marriage, and acknowledgements of the plaintiff's
mother and R. Watson Jackson, that a marriage may have
taken place between the parties at some other different
time and place, and the jury should not infer or presume a
marriage at the time or place so attempted to be proved,
except by testimony that is clear of suspicion, and explicit
and upon reputation that is general among the relatives of
both the respective parties and the community in which
they lived, and supported by conduct between the parties
so continuous and regular as to be consistent with matri-
monial contract. (Rejected.)

*Defendants' 4th Prayer.*—That if the jury shall believe
from the evidence that R. Watson Jackson and the plaintiff's
mother left the home of Mrs. Morris, the grandmother of
the plaintiff, on the morning of some day in the year 1872,
and returned in the evening and said to Annie Morris, the
plaintiff's aunt, and Mrs. Mary Morris, the plaintiff's grand-
mother, that they had been married by a Methodist minister
at the parsonage; and shall further believe from the evi-
dence that there were only two Methodist Churches in the
city of Chester, Pennsylvania, at that time, and that it was
the law of the Methodist Church, and the custom and duty
of the ministers and preachers in charge of the churches and
parsonages at Chester, to record and keep an official entry
of all marriages performed by them; and if they shall fur-
ther find from the evidence in this cause, that the official ·
record for the year 1872, in the said two churches, do not

show a marriage between the plaintiff's mother and R. Watson Jackson, then [this is evidence from which the jury may presume that no such marriage took place at Chester in 1872, and the presumption is that the ministers or preachers in charge of the said two churches discharged their duty in keeping said records of marriage; and if the jury shall believe that no such marriage took place at Chester, at the time and place given in evidence in this cause, then their verdict must be for the defendants.]

This prayer the Court amended by inserting, in lieu of the words within the above brackets, the following: " Then such evidence is to be considered by the jury in connection with the other evidence in the case in determining whether such marriage ever took place at Chester." And the fourth prayer so amended was granted.

*Defendants' 5th Prayer.*—That it is incumbent upon the plaintiff to prove by a preponderance of evidence to the satisfaction of the jury a valid marriage between R. Watson Jackson and the plaintiff's mother, and while the jury may infer or presume a marriage from cohabitation, reputation, acknowledgments and declarations of the parties, yet these facts do not constitute nor make a valid marriage either in Maryland or Pennsylvania, but it is only evidence from which the jury may presume a contract of marriage, if not rebutted or overcome by other evidence, and for the jury to find a valid marriage between R. Watson Jackson and the plaintiff's mother on the evidence of the cohabitation and reputation, declarations and acknowledgements of the parties, then the same must be clear of suspicion, general and supported by other circumstances, and the reputation and cohabitation must be so continuous and regular from the time of its beginning to be consistent with matrimonial union, and the declarations and acknowledgements should not be contradictory; and if the jury shall believe from the evidence that R. Watson Jackson and the plaintiff's mother did live together as man and wife, and did so hold themselves out to the world and so declare, and there was repute of their

marriage in the communities where they lived, yet, in de-
termining or finding from the evidence whether or not they
were married, they should take into consideration the repu-
tation of the plaintiff's mother for chastity, the length of time
they so lived together and held themselves out as man and
wife, the manner and circumstances of their coming to-
gether as husband and wife and so living, the length of time
they lived apart, their conduct, habits and circumstances
since their separation, the declarations of them or either of
them during their separation, and the manner in which they
were received and treated by their respective families and
the society of the community in which they lived during the
time of their cohabitation and the years of their separation.

This prayer the Court amended by instructing the jury
that it is incumbent upon the plaintiff to prove by a pre-
ponderance of evidence to the satisfaction of the jury a
valid marriage between R. Watson Jackson and the plain-
tiff's mother ; and while the jury may infer or presume a
marriage from cohabitation, general reputation, acknowl-
edgements and declarations of the parties, yet these facts
do not constitute or make a valid marriage in Maryland or
Pennsylvania, but they are evidence from which the jury
may presume a contract of marriage and marriage, if not
rebutted or overcome by other evidence, and that to pre-
sume or infer from such evidence a marriage, the circum-
stances of their coming together as man and wife and their
cohabitation, should be clear of suspicion, and the said pre-
sumption should be based on general reputation of mar-
riage ; and if the jury shall believe from the evidence that
R. Watson Jackson and the plaintiff's mother did live to-
gether as man and wife and did so hold themselves out to
the world and so declare, and there was general repute of
the marriage in the community in which they live, yet, in
determining or finding from this evidence whether or not
they were married, they should take into consideration the
reputation of the plaintiff's mother for chastity before the
time of their cohabitation, the length of time they so lived

together, held themselves out as man and wife, the manner and circumstances of their coming together as husband and wife, and so living, the length of time they lived apart, their conduct, habits and circumstances since their separation, the declarations of them or either of them during their separation and the manner in which they were received and treated by their respective families and the society of the community in which they lived during the time of their cohabitation and the years of their separation.

*Defendants' 6th Prayer.*—That in determining the value or weight of the declarations of marriage or not between the said R. Watson Jackson and the plaintiff's mother, as made by them or either of them, the jury must consider all the circumstances under which they were made.   (Granted.)

*Defendants' 7th Prayer.*—That it is incumbent upon the plaintiff to prove by a preponderance of evidence to the satisfaction of the jury, a valid marriage between R. Watson Jackson and the plaintiff's mother, and while the jury may infer or presume a marriage from cohabitation, reputation, acknowledgements, and declarations of the parties, yet these facts do not constitute nor make a valid marriage, either in Maryland or Pennsylvania, but they are evidence from which the jury may presume a contract of marriage, and marriage, if not rebutted or overcome by other evidence, and though the jury shall believe from the evidence that R. Watson Jackson and the plaintiff's mother did live together as man and wife, and did so hold themselves out to the world, and so declare, and there was repute of their marriage in the communities where they lived, yet, in determining or finding from the evidence whether or not they were married, they should take into consideration the reputation of the plaintiff's mother for chastity, the length of time they so lived together and held themselves out as man and wife, the manner and circumstances of their coming together as husband and wife and so living, the length of time they lived apart, their conduct, habits and circumstances since their separation, the declaration of them, or either of

them, during their separation, and the manner in which they were received and treated by their respective families and the society of the community in which they lived during the time of their cohabitation.    (Granted.)

The Court below (PAGE, C. J., HOLLAND and LLOYD, JJ.) granted the plaintiff's prayers and granted the first, sixth and seventh prayers of the defendants, and rejected the second, third, fourth and fifth prayers of the defendants as offered.    The verdict being for the plaintiff, the defendants appealed.

The cause was argued before BRYAN, McSHERRY, BRISCOE ROBERTS and BOYD, JJ.

*James E. Ellegood* (with whom was *John R. Pattison* on the brief), for the appellants.

1. All evidence of a marriage *per verba de presenti* is immaterial and inadmissible in this case.    First.  Because the plaintiff below cannot by virtue of being the issue of such a marriage take property in Maryland, as next of kin of R. Watson Jackson.    Second.  Because the plaintiff undertook to prove a marriage in *facie ecclesiae*, at a certain time and place.    2.  For the same reasons, we submit that the Court erred in its ruling on the prayers of the plaintiff and defendants on that question.    3.  If wrong in the above, we submit that there was no sufficient legal evidence of such a marriage " followed " by cohabitation, general reputation, acknowledgements and recognition by friends, as is required by the law of Pennsylvania, as proven. 4. That defendants' witness may testify as to what they know of the reputation, without being able to say that they know the general reputation of marriage.—10th and 11th Exceptions.    5.  That the general reputation of the plaintiff's mother, after the separation as to her chastity before and after the separation, was admissible.—4th and 8th Exceptions.    6.  That Covington and Parsons had no sufficient knowledge of the general reputation of marriage.—7th and

9th Exceptions. On the first point we concede that the *lex loci contractus* controls the validity of a marriage as of other contracts; but *non constat* that all the incidents thereto, or rights arising incidentally out of it and not vested by it, the status and capacity of all parties affected by it, are to follow them into other jurisdictions. It is not a strict right, but is founded only in comity and convenience.

The authorities abundantly establish that the doctrine of *lex loci contractus* has its exceptions and limitations by other general principles, and that each case must depend upon the proper application of the rule, as a matter of comity, policy and fairness. It is not a question of the rights of the particular individuals, but of the *public* and its best interest that is to be preserved. Now the policy and law of Maryland from its foundation as a State, is that a marriage contract in the words of the present tense is not a marriage, and that cohabitation following such a contract is illicit, and the issue thereof, illegitimate; and that is the policy of the common law as interpreted by our Court of Appeals. *Dennison case*, 35 Md. 361.

Not only are such marriages contrary to the law and policy of Maryland, but they are not encouraged by the law or policy of Pennsylvania. The statute of Pennsylvania declares that " all marriages shall be solemnized by taking each other for husband and wife before twelve sufficient witnesses ;" and " the certificate of the marriage registered ;" and provides for marriages in religious societies after one full month's publication of bans. It also imposes a penalty for violation of the statute. The statute speaks of " solemnized " marriages and " marriage ceremony." In *Hentz* v. *Sealey*, 6 Binn, 407, the Court said that while " no particular form was established by the law of Pennsylvania— the marriage ought to be entered into with consideration and deliberate assent, and ought to be done formally and solemnly." *In Com.* v. *Stump*, 53 Pa. 136, the Court spoke of it as a civil contract, and said, " like all other civil contracts, it should be proven by the signatures of the parties,

or by the witnesses who were present when it was made. They should save their issue from the reproach of bastardy by making a contract of marriage susceptible of proof." Having seen the spirit and policy of the law in both States, the doctrine of comity finds no application in this case. To illustrate : Suppose a brother of the deceased had gone to Pennsylvania and made such a marriage and had issue, and another brother remained in Maryland and contracted a like marriage and had issue. What principle of comity and fairness would there be in allowing the issue of the former to be legitimate and take the property, to the exclusion of brothers and sisters of the deceased; and the issue of the resident marriage to be bastardized and excluded, and the cohabitation of their parents to be treated as concubinage.

If Watson Jackson had been domiciled at the time of his death in Pennsylvania, then the question of the legitimacy of the claimant might have depended upon the law of Pennsylvania, even as to personal property in Maryland, but not as to the real estate here. Giving full effect to the rule of comity, the rights in this case come within the two exceptions applicable to the domicile of the deceased, and to after-acquired property. *Story Conf. of Laws*, section 160 (3rd ed.) Jackson was never domiciled in Pennsylvania, and his actual and legal domicile have always been in Maryland. He only remained in Pennsylvania a few months after the cohabitation, which began there " in the latter part of the summer or early part of the fall of 1872."

We contend that there was error in the prayers submitting to the jury the finding of a marriage *per verba de presenti*, or of any marriage other than that attempted to be proven to have taken place at Chester. The plaintiff undertook to prove a formal marriage with " religious ceremony," at Chester, Pennsylvania, in the spring of 1872, by Annie Morris, the plaintiff's aunt, and also by George W. Bell. Having undertaken to prove this, she could not prove nor submit to the jury to find that there *might* have been a marriage at some other time and place, or a mar-

riage *per verba de presenti*, of which there was absolutely
no proof. The plaintiff did not try to prove a ceremonial
marriage at the former trial. She only proved the declara-
tions of the deceased that he had been married at Chester,
Penn. The form of the marriage was not then proven, nor
attempted. Now she comes with the time and place and
the denomination of the minister who is said to have per-
formed the ceremony. The plaintiff is confined to this.
*Barnum's case*, 42 Md. 297.

*E. Stanley Toadvin* and *Alonzo L. Miles* (with whom was
*George W. Bell* on the brief), for the appellee.

McSHERRY, J., delivered the opinion of the Court.

This case is now before us for the second time. The
first appeal is reported in 80 Md. 176. The legal princi-
ples applicable to the controversy were then laid down, and
upon a reversal of the judgment the cause was remanded
for a new trial. A new trial was had resulting in the same
verdict and judgment that were recorded on the first trial,
and the same parties have again appealed who were the
appellants on the former occasion. There was but a single
issue involved, and that was whether the appellee is the
legitimate daughter of Richard Watson Jackson, who died
intestate some years ago. In passing on this issue two
juries in different counties have found by their verdicts that
she is. The record now before us contains twelve bills of
exception, but it will not be necessary to review them sepa-
rately, because they form several distinct groups, presenting
but few questions which require any discussion.

The alleged marriage of the appellee's mother and father,
if it took place as has been twice found by separate juries,
took place in the State of Pennsylvania. The evidence relied
on to establish this marriage was general reputation, cohabi-
tation and acknowledgment. The admissibility and suffi-
ciency of such evidence to prove a marriage was fully con-
sidered on the former appeal, and we need not repeat here

what was so recently decided there.    There was no effort
to prove as a distinct fact that the marriage had been per-
formed with any religious ceremony.    It is true that one of
the witnesses in giving the declarations of the parties, stated
that they, the mother and father of the appellee, upon one
occasion said they had been married by a minister of the
gospel.    But it must be borne in mind that the appellee, who
was seeking to prove her legitimacy, did not set up a mar-
riage of her parents at a particular place by a particular form
or ceremony.    Had she done this and failed she would not
have been at liberty to rely on general repute to establish
the alleged marriage.    *Barnum* v. *Barnum*, 42 Md. 251.
Assuming there was no religious ceremony proved or
attempted to be proved, as there was not, it has been insisted
with great zeal and earnestness that even if the marriage
found by the verdict of the jury to have been contracted
and consummated in Pennylvania were valid by the laws of
that State, yet the legitimacy of the appellee, who was born
in Pennsylvania, where her parents then lived, must be
determined, not by the laws of that State, but by the law of
Maryland; and that if, therefore, the marriage were, by
reason of the failure to show there had been some religious
ceremony, one that would not on that account have been
valid under the statutes of Maryland, the issue of such a
marriage would in Maryland be illegitimate even though the
marriage of which that issue was the fruit were conceded to
be perfectly valid in the State where it was contracted and
consummated.    And the case of *Doe on the demise of Birt-
whistle* v. *Vardill*, 5 B. & C. 438, was much pressed upon
us to support that view.    But that case and others founded
on the same settled principle are clearly distinguishable from
the case at bar.    It is a maxim as old as the common law that
*hæres legitimus est quem nuptiæ demonstrant.*   A marriage, if
valid where solemnized, is, in *general*, valid everywhere, and
of necessity the offspring of that marriage would be treated
as legitimate wherever the marriage itself would be regarded
as valid.    But a local statute which makes an illegitimate

child, or a child born out of wedlock, legitimate upon certain prescribed conditions, such as the subsequent marriage of the parents and the recognition of the child as theirs, can have no extra territorial operation, and therefore cannot give to such child in another jurisdiction an inheritable *status* not accorded to it by the law of the latter jurisdiction.    By the law of England a child born out of wedlock was a bastard. By the law of Scotland the subsequent marriage of the father and mother, and their recognition of the child as theirs legitimated the child.    But that statute could not operate upon real estate in England where the law gave to such a marriage no effect as legitimating prior born children.    The same principle was decided in *Barnum* v. *Barnum*, 42 Md. 251, and *Smith* v. *Derr*, 34 Pa. St. 126.    We have said that *in general* a marriage valid where performed is valid everywhere.    To this broad rule there are, however, exceptions. " These exceptions or modifications of the general rule may be classified as follows : *First*, marriages which are deemed contrary to the law of nature as generally recognized in Christian countries ; *second*, marriages which the local law-making power has declared shall not be allowed any validity. *    *    *    To the first class belong those which involve polygamy and incest ; and in the sense in which the term incest is used, are embraced only such marriages as are incestuous according to the generally accepted opinion of Christendom, which relates only to persons in direct line of consanguinity, and brothers and sisters.    The second class, *i. e.* those prohibited in terms by the statute, presents difficulties that are not always easy of solution, and have led to conflicting decisions.    This class may be subdivided into two classes ; *first*, where the statutory prohibition relates to form, ceremony and qualification, it is held that compliance with the law of the place of marriage is sufficient ; and its validity will be recognized, not only in other States generally, but in the State of the domicil of the parties, even when they have left their own State to marry elsewhere, for the purpose of avoiding the laws of their domicil.    Instead of being

called a subdivision of the second-class of exceptions, it would be more accurate to say that it is an exception to the exception and falls within the operation of the general rule first announced, of 'valid where performed, valid everywhere.' To the *second* subdivision of the second-class of exceptions belong cases which, prohibited by statute, may or may not embody distinctive State policy, as affecting the morals or good order of society." *Pennegar* v. *The State of Tennessee*, 87 Tenn. 244 ; S. C. with copious notes, 2 L. R. A. 703 ; *State* v. *Tutty ; State* v. *Ward*, 41 Fed. Rep. 753 ; S. C., 7 L. R. A. 50 ; *Brook* v. *Brook*, 9 H. L. C. 193 ; *Com.* v. *Graham*, 16 L. R. A. 580 ; S. C., 157 Mass. 73.. It is obvious, then, as there is no statute in Maryland declaring that a marriage of whose existence there is no other proof than general reputation shall be void ; and as at most the statutory provisions relative to the methods of solemnizing marriages in Maryland relate to form and ceremony only, the Courts of this State will recognize the Pennsylvania marriage as valid if that marriage is valid by and under the laws of the latter Commonwealth and does not contravene the declared policy of our own positive law. We are not to be understood as speaking of marriages tolerated elsewhere but denounced by our own positive State policy as affecting the morals or good order of society. Such marriages, however, regarded elsewhere would not be treated as valid here. For instance : The statutes of Maryland peremptorily forbid the marriage of a white person and a negro and declare all such marriages forever void. It is, therefore, the declared policy of this State to prohibit such marriages. Though these marriages may be valid elsewhere, they will be absolutely void here so long as the statutory inhibition remains unchanged. But the question before us does not belong to such a category. At most all that is asserted against the validity of the alleged marriage of the appellee's parents has reference to form or ceremony, and these, as we have seen, do not cause a marriage to fall within any of the exceptions 'to the general

rule that a marriage valid where performed is valid every-
where. These views merely supplementing what we said
in 80 Md. sufficiently answer the objections to and the
criticisms upon the instructions granted by the Court below
at the instance of the appellee; and without going into a
further examination of these instructions, we content our-
selves with saying there was no error committed in giving
them.

The rejected prayers of the appellants were properly re-
fused. The whole law of the case was fully, fairly and
clearly put before the jury in the instructions given at the
instance of both parties. The hypothesis assumed in the
appellant's second prayer, that the intercourse between the
appellee's mother and father was illicit in the beginning,
was not supported by a particle of evidence, and it would
have been error to allow vague conjectures to be indulged
in by the jury on that subject. The third prayer was faulty
in submitting to the jury to find that the appellee under-
took to prove that a marriage took place between her father
and mother at Chester, Pennsylvania. The record does not
show that she set up any such marriage. As already men-
tioned, there was some allusion by a witness to a statement
made by the parents of the appellee as to the place where
they were married ; but the appellee never attempted to
assert that a marriage was actually solemnized at Chester.
These observations dispose of all the questions raised by
the twelfth exception.

This brings us to the eleven exceptions involving the
rulings of the Court on questions of evidence.

The first exception was taken to the ruling of the Court
allowing a witness to prove the law of Pennsylvania, as to
the requisites of a valid marriage in that State, in the years
1872 and 1873. The witness was a lawyer of that State,
and had· deposed that he was familiar with the law there.
We think, under repeated adjudications, he was competent
to give evidence. *Jackson* v. *Jackson*, 80 Md. 176.

With reference to the second, third and sixth exceptions,

it is only necessary to say that the answers are not set forth in the record, and we are therefore unable to decide whether, even if the questions were conceded to be inadmissible, any injury was done to the appellants. Where the answers are not given, it cannot be assumed that they were prejudicial to the appellant. If not prejudicial they could cause no injury, and unless injury and error both appear there is no ground for reversal. The question objected to in the fourth exception was not competent. It appeared that after the father and mother of the appellee had lived together several years, and after the birth of the appellee they separated. In the fourth exception a witness was asked whether he knew the general reputation of the appellee's mother *after* the separation for chastity, while she and Jackson were living together. Whilst evidence of her general reputation for chastity, before the alleged marriage and during the period she lived with Jackson as his reputed wife, was admissible to rebut the presumption of marriage (*Jackson* v. *Jackson, supra*), it was manifestly irrelevant to adduce evidence of such a reputation *after* the parties had separated and had ceased to live together. As offered it would have been allowing evidence of a reputation that she had had a reputation for the want of chastity at some antecedent time. It was not evidence of a general reputation for unchasteness, but evidence of a reputation that she had had such a reputation. It was consequently not evidence of a reputation at all. For the same reasons there was no error in the ruling complained of in the eighth exception. The fifth exception was abandoned. The objection urged to the evidence set forth in the seventh and ninth exceptions goes to the value and not to the admissibility of the evidence. If admissible, as it was, its value was for the jury. The tenth and eleventh exceptions present the only question remaining to be considered. In the tenth a witness was asked, "do you know of any reputation in the community of Salisbury on the subject of their marriage, at the time they were living together? If yea, was

that a general reputation or a divided reputation ? " In the eleventh the question objected to was, " was there or not a divided reputation in the community of Salisbury as to the subject of their being married, while they lived together as man and wife ? " Both of these questions were excluded. A reputation to be a provable reputation at all, must be a general reputation. It may be either one of two opposites ; for instance, either good or bad. It cannot be intermediate ; that is, partly one and partly the other, for that would not be general, and there would then be no general reputation either way. If it is generally good or generally bad, or as applicable to the case at bar, if a man and woman are generally reputed to be married, or if the converse is generally asserted, a general reputation one way or the other exists, and of a general reputation, and none other, the law allows evidence to be given. But if it be not general, then obviously it does not exist as a fact, and evidence cannot be received to show a partial, limited or qualified repute. · When the Courts employ the term " divided reputation," it is not meant that an individual can have such a .thing as two opposite general reputations at the same time. A condition of that sort is an impossibility. A reputation cannot be general if it is not general, and no reputation of a marriage but a general reputation is competent evidence to establish marriage. General reputation, whether affirmative or negative, is a fact to be proved like any other fact within the knowledge of witnesses, by the witnesses who know it. If it exists at all it exists as a fact    That which goes to make it up is hearsay, but that which the hearsay does make up is a fact. Now when parties are generally reputed to be man and wife, the general reputation thus asserted is a fact. If the witness called to establish that fact does not know that such a general reputation prevails in the community, he does not know the parties' general reputation on that subject, and of course he can give no evidence of it. Necessarily the method to disprove such an asserted fact must be by witnesses equally

competent to speak; and hence, unless the witness knows or can say that the particular person has no general reputation, on that particular subject he cannot testify that no general reputaion exists. A divided reputation, which is but the result of conflicting evidence as to a general reputation, is not a distinct, substantive, provable fact, for it is a mere deduction from proved facts. The existence of a diversity of opinion is one of the means by which a witness may know there is no general reputation; but this means of knowledge, apart from the fact that there is or is not a general reputation, and as a totally independent circumstance, is not the thing to be proved. Hence, to ask the witness whether there is a divided reputation, is to ask him, not whether he knows a provable fact—a general reputation *one way* or the other—but merely what is one source of knowledge without reference to whether he possesses the knowledge itself. He may testify if he can that the parties were generally reputed not to be married; or, having equal means of knowing that they had a general reputation as other witnesses who have testified that the parties did have such a general reputation, he has never heard it discussed or spoken of. In the one instance he would testify to a fact just as the witnesses who depose in the opposite way. In the other instance he would depose to facts which if believed by the jury would tend to discredit the evidence to establish a general reputation. But in neither instance could he be permitted to say that there was a divided reputation, for that is nothing more than the result of the witness' conclusion from his own comparison of conflicting opinions. There was, therefore, no error committed by the rulings in these exceptions. Finding no error in any of the rulings excepted to, they will be affirmed.

*Rulings affirmed with costs in this Court and cause remanded.*