*In the Matter of Robert H. Watkins, Jr.,* No. 2171, September Term 2017

**ESTATE ADMINISTRATION – UNCLEAN HANDS.**  The Orphans' Court for Prince George's County found that appellant, the wife of decedent at the time of the decedent's death, procured the marriage by undue influence. The decedent and his wife were residents of Florida, but the decedent was domiciled in Maryland. The court, applying a Florida statute, held that the wife was barred from receiving an elective share of the estate. The factual findings of undue influence and a Maryland domicile were not challenged on appeal. Appellant challenged the relief that was granted. Held: the Florida statute was inapplicable but the judgment was affirmed on the ground that appellant was barred from receiving a benefit from the estate by the doctrine of unclean hands.

.

Orphans' Court for Prince George's County
Estate No. 97,794

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2171

September Term, 2017

_____

IN THE MATTER OF ROBERT H.
WATKINS, JR.

_____

Berger,
Leahy,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, James R., J.
_____

Filed:  May 29, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Robert F. Watkins, Jr. ("the Decedent") died on August 30, 2014 at the age of 82. He was survived by his third wife of less than two years, Emeline Wilson Watkins ("Emeline"), the appellant; his adult daughter from his second marriage and the personal representative of his estate, Shannon Watkins ("Shannon"), the appellee; and his adult daughter from his first marriage, Hannah Ink ("Hannah"). The Decedent's second wife of 52 years, Jasmine Watkins ("Jasmine") predeceased him in 2012.

On September 18, 2014, Shannon filed a petition for administrative probate with the Register of Wills for Prince George's County. By order of September 24, 2014, the Decedent's Last Will and Testament dated January 28, 1999, together with a Codicil dated November 16, 2006 (collectively "the Will"), were admitted to probate and Shannon was appointed Personal Representative of the Estate. Shannon filed a Petition for Ancillary Administrative Probate in Broward County, Florida, where the Decedent owned real property ("the Florida Probate Action").

On March 23, 2015, Emeline filed in the Orphans' Court for Prince George's County an "Objection and Petition to Revoke Probate and Letters Testamentary" on the ground that the Decedent was domiciled in Florida, not Maryland, when he died.[1] She asserted that the Maryland probate matter should be closed and that the Decedent's

---

[1] Emeline also filed an objection in the Florida Probate Action, arguing that an "ancillary" action was not appropriate for a Florida domiciliary. On or about April 23, 2015, the Florida court entered a stay pending a determination of domicile by the Maryland court.

Maryland assets should be administered by a foreign personal representative within the Florida Probate Action.

Shannon, in her individual capacity and as Personal Representative, opposed Emeline's petition to revoke probate. She maintained that the Decedent was domiciled in Maryland when he died and asserted that Emeline's marriage to the Decedent was procured by fraud, duress, and undue influence. Shannon asked the Orphans' Court to overrule Emeline's objection and rule that she was barred from receiving any share of the Estate based upon a Florida statute and/or under the common law doctrine of unclean hands.

Thereafter, Emeline filed in the Orphans' Court her "Election to take Statutory Share of the Estate," pursuant to Md. Code (2001, 2011 Repl. Vol.), section 3-203(b) of the Estates and Trusts Article ("ET").

Following a hearing in the Orphans' Court, a two-judge panel issued an opinion and order. The court, applying Maryland law, found, in pertinent part, that the Decedent was domiciled in Maryland when he died; that Emeline procured her marriage to the Decedent by undue influence; and that in light of her conduct and by operation of a Florida statute, she was ineligible to receive any benefit from the Estate.

Emeline appealed, and in her brief, presented three questions which we have condensed and rephrased as two:

> I. Did the Orphans' Court err by determining that the Decedent was domiciled in Maryland when he died?

-2-

II. Did the Orphans' Court err or exceed its authority by denying Emeline her statutory share of the Estate based upon a finding that her marriage to the Decedent was procured by undue influence?

At oral argument, Emeline abandoned the first issue, clarified that she was not challenging the factual finding of undue influence and, for the first time, argued that the Orphans' Court lacked subject matter jurisdiction. For the following reasons, we hold that the Orphans' Court had subject matter jurisdiction and did not err. We shall affirm the judgment of the Orphans' Court.

## FACTS AND PROCEEDINGS

The Orphans' Court held a three-day evidentiary hearing in December 2015. In her case and on behalf of the Estate, Shannon testified and called six witnesses: Jeffrey Komins ("Jeffrey"), Shannon's husband; Hannah; Craig Nicholson, a close friend of the Decedent; Carlton Green, Esq., the Decedent's personal lawyer and friend, who testified both as a lay witness and as an expert in the field of estate and probate administration, real estate law, and business law; Brian Crowley, M.D., who testified as an expert in psychiatry; and Emeline. In her case, Emeline testified and called two expert witnesses: Robert Young, Esq., who testified as an expert in estate and probate law; and Christine Tellefsen, M.D., who testified as an expert in psychiatry. We summarize the pertinent evidence.

The Decedent was born in Washington, D.C., and grew up in and around Prince George's County, where his father was a real estate developer involved in the establishment of College Park. In 1937, the Decedent's father built a family home at

4502 Beechwood Road in College Park, which has since been designated as a historic property ("Beechwood Road House").

When the Decedent was in his early twenties, he married Patricia Morris Watson. Hannah was born of that marriage in 1956.[2] Their marriage ended in divorce around 1959.

In October 1959, the Decedent married Jasmine. They lived together in Hollywood, Florida. Shannon was born to them in 1966.

In 1978, the Decedent, Jasmine, and Shannon moved to Maryland, where they lived in a house on Drexel Road in College Park that was owned by the Decedent's mother. (The Decedent's father had died many years earlier.)

In 1987, the Decedent's mother died and the Decedent inherited the Beechwood Road House. Shannon lived there with the Decedent and Jasmine until 2004, when she married her husband and purchased her own house nearby.

The Decedent's family owned and managed numerous apartment buildings in College Park, which he inherited. During his marriage to Jasmine, she managed the rental properties by collecting payments, advertising vacancies, paying taxes, and arranging repairs. The Decedent and Jasmine also owned thoroughbred racehorses and maintained an account with Maryland Thoroughbred Purse Account, Inc., in Laurel ("Purse Account"). Their income was derived from these business assets.

---

[2] The record does not reflect when the Decedent married his first wife, but it was sometime before July 31, 1956, when Hannah was born.

The Decedent and Jasmine were "snowbirds" who routinely traveled to Hollywood, Florida during the winter months, from December through March, to stay in a house at 937 Adams Street that Jasmine owned ("the Florida Property"). They made their last trip to the Florida Property together in early 2012, shortly before Jasmine died.

During his marriage to Jasmine, the Decedent was physically active and social. He played golf several times each week. He and Jasmine went to the racetrack together multiple times each week, went out to dinner, went to the movies, and hosted family for cookouts and celebrations. Shannon and Jeffrey have two children, and the Decedent was extremely close to them, spending time with them on a weekly basis.

In 2009, Jasmine was diagnosed with bladder cancer. The Decedent was her primary caregiver during her illness, taking her to all her medical appointments. By the end of 2011, Jasmine's cancer had metastasized and she was terminally ill.

In early 2012, shortly before Jasmine died, the Decedent took her to Bloomingdales in Chevy Chase to buy makeup. Emeline worked at the cosmetics counter and assisted them. Emeline learned during that encounter that Jasmine was sick. Emeline also learned that the Decedent owned racehorses and she expressed interest in seeing his horses race. Emeline and the Decedent later arranged to meet for lunch at a P.F. Chang's restaurant.[3] Emeline denied that the Decedent disclosed that Jasmine was dying of cancer during their lunch.

---

[3] Emeline claims the Decedent contacted her to arrange this lunch.

Jasmine died on March 17, 2012. According to the Decedent's longtime friend and lawyer, Mr. Green, the Decedent was "absolutely devastated." Shannon described him as "despondent" and a "mess." Jeffrey characterized him as "very depressed." The Decedent told Jeffrey that there was "no need for [him] to be around anymore." The day after Jasmine's funeral, the Decedent drove to Florida alone. He stayed for just a day or two and then drove back. He later told Shannon that he drove "erratically and terribly" because he did not care if he lived or died.

Within weeks of Jasmine's death, the Decedent was spending most of his time with Emeline. Emeline soon quit her job at Bloomingdales, where she had earned an annual salary of $45,000. Upon being questioned about their relationship, the Decedent told Shannon, Hannah, and other family and friends that he had no intention of marrying Emeline.

During the summer of 2012, Shannon noticed signs that the Decedent was confused. On one occasion, he forgot to shut the front door to his house, leaving it wide open for an entire day and night. On another occasion, he could not remember how to open the basement door of the Beechwood Road House. He also had difficulty remembering where he had parked his car.

Around the same time, Shannon discovered that the Decedent had made large and unusual credit line advances from an account at BB&T Bank that was held jointly by the

Decedent and Shannon[4] ("the Joint BB&T Account"). The account was used to pay taxes and other expenses on the rental properties owned by the Decedent and now managed by Shannon. In early August 2012, while Shannon was straightening up the Decedent's bedroom, she discovered two cashier's checks dated July 31, 2012 in the amounts of $20,000 and $2,000 drawn on the credit line of the Joint BB&T Account.[5] Shannon called the Decedent and told him that she was going to take the checks back to BB&T and endorse the checks back over to the bank.

On August 13, 2012, the Decedent obtained a $14,000 cashier's check drawn on the credit line for the Joint BB&T Account. He later gave this check to Shannon as well.

On August 16, 2012, with her father's knowledge and consent, Shannon went to the bank to cause the three cashier's checks to be deposited back into the Joint BB&T Account. While she was there, the Decedent showed up. Shannon reiterated that she was going to "put this money back in the account and he said okay[.]"

After Shannon completed the transaction, she left the bank. In the parking lot, she observed Emeline sitting in her car. Shannon got in her car and left briefly, but then returned to the BB&T parking lot. When she returned, she observed the Decedent walk out of the bank with another check in his hand. He walked over to Shannon's car and told her "I got another check out." He was holding a cashier's check in the amount of $40,000. Shannon asked the Decedent to give it to her, but he refused. Shannon took the

_____

[4] Jasmine's name also was on the account.

[5] The credit limit on the account was $96,000.

check from the Decedent and ripped it up. She then went back inside the bank, asked the bank teller to reissue the check she had destroyed, and then caused the check to be deposited back into the Joint BB&T Account.

Later that night, the Decedent came to Shannon's house and apologized. He explained that Emeline "wanted a house in Palm Beach, [Florida] and after [Shannon] had taken the initial check, [Emeline] told him to go back in and get the other one." The Decedent explained that the checks were to be used for a down payment. According to Shannon, had she not returned the funds to the Joint BB&T Account, she could not have paid the 2012 property taxes for the rental properties owned by the Decedent.

In late August or early September 2012, Shannon learned that the Decedent took a trip to West Virginia with Emeline. The Decedent told Shannon about the trip "the day he came back." He was "upset" and explained that he had told Emeline he would marry her in West Virginia, but that he had changed his mind. The Decedent said that when he told Emeline that he no longer wanted to marry her, she "beat him up, she jumped on his chest and was beating him and was scratching him . . . ." In her deposition testimony, Emeline was asked about this incident and said that she "didn't jump on him."

In mid-September 2012, the Decedent took a trip to Florida with Emeline. He stayed for about a week. On September 24, 2012, Emeline and the Decedent were married at the Broward County courthouse. None of their family or friends were present and no one knew about the marriage in advance. The Decedent did not tell Shannon that he had married Emeline for more than a month after they returned. At some point, Emeline called Hannah and told her about their marriage. Emeline was "kind of

laughing" during the phone call. Hannah spoke to the Decedent and he seemed "very matter of fact" about the news.

In late November 2012, the Decedent and Emeline met with Mr. Green, who as mentioned was the Decedent's close friend and his attorney, at Mr. Green's law office to discuss matters relative to closing out Jasmine's estate. During that meeting, Emeline became irate and began screaming and calling Jasmine a "whore" and an "adulteress." According to Mr. Green, the Decedent "just sat there and did nothing" looking like "a deer in the headlights." Shannon was in the waiting room during part of the meeting. Mr. Green's secretary asked Emeline to leave the office. Within days after that meeting, Emeline and the Decedent left for Florida.

Shannon had no contact with the Decedent between the day of that meeting and May 2013, when he returned to Maryland for a visit. She made numerous attempts to reach the Decedent on his cell phone, but he did not answer. She also went online and activated the landline at the Florida Property[6] and attempted to call the Decedent at that number. She received no answer and the landline ultimately was disconnected.

Back in December 2012, while Jeffrey and Shannon were vacationing in Florida, Jeffrey went to the Florida Property to check on the Decedent. The Decedent's car was parked out front. Jeffrey knocked on the door and he heard Emeline say, "who's there?"

---

[6] Ordinarily, the phone was activated only when the Decedent was staying in Florida.

Jeffrey identified himself and Emeline replied, "wait a minute." Jeffrey waited 20 to 30 minutes, but nobody ever opened the door.

The Decedent visited Maryland again in late August 2013. He showed up unannounced at Shannon's house. When the Decedent left, Shannon noticed that he was driving a brand-new car, a 2014 Audi R3. The Decedent had purchased the car in Silver Spring, Maryland on August 28, 2013 and had financed the purchase price of $104,998. Just 16 days later, on September 13, 2013, the Decedent went to a Mercedes dealership in Ft. Lauderdale Florida and traded in the Audi for a 2013 Mercedes-Benz SL63 Roadster. The trade-in allowance was $70,000, nearly $35,000 less than the Decedent had paid for the Audi just over two weeks earlier. The Decedent financed the $197,874 purchase price. The monthly payments on the Mercedes were over $3,000.

In her testimony, Emeline claimed that it was the Decedent's decision to purchase both vehicles, which were titled only in his name. She acknowledged that within a short time after the purchase of the Mercedes, the Decedent stopped driving and she alone drove the Mercedes. She further admitted that after the Decedent died, she continued to drive the Mercedes until Shannon reported it stolen.

After the Decedent's August 2013 trip to Maryland, Shannon was again unable to reach the Decedent by telephone. Consequently, she contacted the police department in Hollywood, Florida to request a "wellness check." The police went to the Florida Property to check on the Decedent. The Decedent called Shannon and left her a voicemail message asking about his grandchildren and telling her that he loved her.

Emeline could be heard in the background on the message taunting, "We're still alive. We're still alive."

According to documentary evidence, on September 24, 2013, the Decedent registered to vote in Florida. There was conflicting testimony as to whether the Decedent registered to vote the same day he and Emeline were married, on September 24, 2012, or a year later. The voter registration application was filled out by Emeline. The Decedent never voted in Florida. Mr. Green testified that, to his knowledge, the Decedent never had voted in his life.

The Decedent's long-time friend, Mr. Nicholson, was unable to reach the Decedent by telephone after he relocated to Florida. In 2013, Mr. Nicholson was training a horse owned by the Decedent. He could reach the Decedent only when he called Emeline's cell phone and "persisted and asked to talk to him." On one occasion, the Decedent contacted Mr. Nicholson by telephone and asked him to manage the Decedent's Purse Account because his horseracing earnings were being sent to Florida and "he wasn't getting any [of the] money." Mr. Nicholson contacted the bookkeeper for the Purse Account and learned that the Decedent needed to contact the bookkeeper directly to authorize Mr. Nicholson to manage the account.

Emeline testified that the Purse Account checks were mailed to the Decedent at the Florida Property. She deposited the checks in the Decedent's Florida bank account. Emeline knew the Decedent's PIN for that account and used his ATM card to make large cash withdrawals.

In early 2014, Jeffrey made a trip to Florida to check on the Decedent. He contacted the police in advance of his visit to the Florida Property and the police agreed to accompany him to the home. Around 1 p.m., a police officer knocked on the door and Emeline answered. The Decedent eventually came to the door. He was clothed only in boxer shorts and appeared as if he had just gotten out of bed. The Decedent got dressed and agreed to speak to Jeffrey for a few minutes. The Decedent told Jeffrey that "Emeline throws his cell phone away" and that the "house phone was disconnected." He called Emeline a "relentless pitbull."

In her testimony, Emeline acknowledged that the Decedent had no social contact with anyone other than her in 2014, characterizing him as a "loner." He was no longer driving in 2014. He spent most of his time in his boxer shorts.

In late August 2014, the Decedent was hospitalized in Florida. During the last few days of his life, Emeline made daily ATM withdrawals from the Decedent's Florida bank account in the amount of $700, the maximum daily amount.[7] After the Decedent's death, Emeline caused a $15,000 payment out of the Florida bank account to be made on the Mercedes.[8]

Both parties called expert witnesses at the trial to offer opinions relative to the Decedent's mental state when he married Emeline and in the periods before and after the

---

[7] The records from the Decedent's Florida bank account reflected twenty-four cash withdrawals from ATM machines in the amount of $700 ($16,800) between February 19, 2014 and August 29, 2014, the day before the Decedent died.

[8] Shannon reversed that payment.

marriage. Dr. Crowley, who was admitted as an expert in psychiatry generally and forensic psychiatry specifically, testified in Shannon's case. He had reviewed the Decedent's medical records, deposition testimony given by Shannon, Hannah, Mr. Green, and Emeline, and pertinent pleadings. Dr. Crowley noted that in 2012, the Decedent suffered from "uncontrolled" Type II diabetes, aortic insufficiency, and Parkinson's disease. There was evidence that he was experiencing a "decline of soft memory" near the end of his life.

Dr. Crowley found significant the Decedent's social history. He was raised in an affluent family and never worked. The real estate business that sustained him financially had been managed by Jasmine during their 52-year marriage and, upon her death, was taken over by Shannon. He had "always had the important women in his life guiding him and running his . . . money." In Dr. Crowley's view, the Decedent was "a dependent man who has always needed a strong woman or women to guide him[.]"

Dr. Crowley opined that the Decedent's behavior in the aftermath of Jasmine's death and up until his death was consistent with a "major depressive disorder." Specifically, the Decedent's "hopelessness, mental confusion," noncompliance with his prescribed medication as evidenced in his medical records, "emotional pain," and "fatigue" all were consistent with that diagnosis. Dr. Crowley also found significant the Decedent's "passive suicidal ideation" when he drove to Florida after Jasmine's death and the changes in his mood and personality described by family and friends. Dr. Crowley further opined that there was evidence that the Decedent suffered from complex

bereavement disorder, which is grief that causes an individual's "mental state [to] change."

Considering the Decedent's dependency on Jasmine, his depression, and his grief, Dr. Crowley opined that the Decedent was "very vulnerable to be influenced by a new woman[.]" In light of the evidence that Emeline dominated the Decedent, physically attacked him when he declined to marry her in West Virginia, and isolated him from his family and friends, Dr. Crowley concluded that Emeline procured her marriage to the Decedent by undue influence.

In her case, Emeline called Dr. Tellefson, who was accepted as an expert in the field of psychiatry. She had reviewed the Decedent's medical records and deposition testimony given by Emeline, Shannon, Hannah, Mr. Green, and Dr. Crowley. Dr. Tellefson opined that "[o]ther than grief [she] did not see any other indication [that the Decedent had] any mental disorder." She emphasized improvements in the Decedent's control of his diabetes and a stabilization of persistent weight loss that occurred in the months following Jasmine's death (and preceding his marriage to Emeline) that, in her view, were indicative of improving mental health and were inconsistent with a diagnosis of depression.

Emeline also called Robert Young, Esq., who was accepted as an expert "in the area of estates and probate law." We shall discuss his testimony, *infra*.

Nearly two years after the conclusion of the hearing, on December 4, 2017, a two-judge panel of the Orphans' Court issued a 31-page opinion. On what it characterized as the "primary issue" of domicile, the Orphans' Court found that the Decedent established

-14-

a domicile in Maryland in 1978 with Jasmine and that his relocation to Florida at the end of 2012 did not evince an intent to abandon his Maryland domicile. Applying Maryland law with respect to the elements of undue influence, the Orphans' Court found that Emeline took undue advantage of the Decedent's vulnerability in the immediate aftermath of Jasmine's death and "physically and emotionally dominated [him]" to induce him to marry her. It concluded, based upon a Florida statute, that Emeline's conduct deprived her of any entitlement to a share of the Estate. We shall discuss the Orphan's Court's findings and conclusions in more detail, *infra*.

## STANDARD OF REVIEW

In reviewing the decision of the Orphans' Court, we defer to its findings of fact and will not set them aside unless clearly erroneous. *See* Md. Rule 8-131(c) (governing the standard of review for actions tried without a jury); *see also Pfeufer v. Cyphers*, 397 Md. 643, 648 (2007) ("It is well settled that the findings of fact of an Orphans' Court are entitled to a presumption of correctness.") (internal quotations omitted). The Orphans' Court's resolution of questions of law, however, are not entitled to deference and are reviewed *de novo*. *See* Md. Rule 8-131(c); *Clancy v. King*, 405 Md. 541, 554 (2008) (clearly erroneous standard "does not, of course, apply to legal conclusions") (citation omitted).

# I.

## Domicile

A person's domicile is

> "the place with which an individual has a settled connection for legal purposes and the place where a person has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he had, whenever he is absent, the intention of returning."

*Wamsley v. Wamsley*, 333 Md. 454, 459 (1994) (quoting *Dorf v. Skolnik*, 280 Md. 101, 116 (1977)); *see also Thompson v. Warner*, 83 Md. 14, 20 (1896) (domicile is the place that is "the 'center of [a person's] affairs' and the place where the business of his life [is] transacted"). "[A] person may have several places of abode or dwelling, [but] he or she 'can have only one domicile at a time.'" *Blount v. Boston*, 351 Md. 360, 367 (1998) (quoting *Bainum v. Kalen*, 272 Md. 490, 497 (1974)). Intent is the "controlling factor" in determining domicile. *Wamsley*, 333 Md. at 459 (citation omitted).

"The two most significant objective factors evidencing a person's intent regarding domicile are where the person lives and where he or she votes or is registered to vote." *Blount*, 351 Md. at 368-69 (citing *Bainum*, 272 Md. at 498). As the *Blount* Court explained, however, while "actual residence and voting" are important, "numerous other factors are also pertinent to show a person's intent." *Id*. at 369. Moreover, other factors take on added significance "'where there are special circumstances explaining a particular place of abode or place of voting.'" *Id*. (quoting *Bainum*, 272 Md. at 499). In those circumstances, a court may:

look to and weigh a myriad of other factors . . . includ[ing] . . . : the paying of taxes and statements on tax returns; the ownership of property; where the person's children attend school; the address at which one receives mail; statements as to residency contained in contracts or other documents; statements on licenses or governmental documents; where furniture and other personal belongings are kept; which jurisdiction's banks are utilized; membership in professional, fraternal, religious or social organizations; where one's regular physicians and dentists are located; where one maintains charge accounts; and any other facts revealing contact with one or the other jurisdiction.

*Bainum*, 272 Md. at 499; *see also Bergmann v. Bd. of Regents of Univ. Sys. of Md.*, 167 Md. App. 237, 275 (2006) ("The definition of domicile is not rigid, and the criteria can be molded to meet special circumstances[.]").

"[O]nce a person has clearly established his or her domicile in a particular geographical area, there is a presumption that it continues, and the person retains his [or her] domicile there unless the evidence affirmatively shows an abandonment of that domicile and the acquisition of a new one." *Stevenson v. Steele*, 352 Md. 60, 70 (1998) (citations omitted). For a change of domicile to be effective "there must be an actual removal to another habitation, coupled with an intention of remaining there permanently or at least for an unlimited time." *Shenton v. Abbott*, 178 Md. 526, 530 (1940); *see also Oglesby v. Williams*, 372 Md. 360, 374 (2002) ("First, the person must intend to abandon his or her former domicile. Second, the new place of habitation must be intended by the person to be the new domicile.").

The Orphans' Court focused on "the circumstances of how the Decedent ended up in Florida and how he became registered to vote [there]." It found that Emeline took advantage of the Decedent's poor health and his grief over Jasmine's death and

convinced him to go to Florida. Once there, she isolated him and "made it very difficult for him to return to Maryland." While the Decedent spent "the majority of his last two years in Florida," it was not by his choice. Rather, Emeline chose for them to stay there because she was better able to exert control over the Decedent when he was away from his daughters and his close friends. Thus, his physical presence in Florida in 2013 and 2014 did not evince an intent on his part to abandon his domicile in Maryland.

In view of Emeline's abandonment of her challenge to the finding of domicile, we have no need to review the evidence in detail. Suffice it to say that the evidence, including expert testimony, was sufficient to sustain the court's finding.

## II.

### Subject Matter Jurisdiction

At oral argument, Emeline asserted that the Orphans' Court lacked subject matter jurisdiction because it applied a Florida statute in error and because only a circuit court could void a marriage.[9] As we discuss in the next section, the Orphans' Court erred in applying the Florida statute. With respect to subject matter jurisdiction, moreover, the issue is one of conflict of laws and does not affect subject matter jurisdiction. With respect to the argument relating to voiding the marriage, the short answer is that the Orphans' Court did not void the marriage. The court barred Emeline from exercising any right to an elective share, based on undue influence. As discussed above, Emeline

---

[9] The lack of subject matter jurisdiction can be raised at any time. *See* Md. Rule 2-324(b).

conceded that the Decedent was domiciled in Maryland. The Orphans' Court's decision was a valid exercise of its subject matter jurisdiction over the administration of estates. *See Ibru v. Ibru*, 239 Md. App. 17, 34 (2018), *cert. denied*, __ Md. __ (Feb. 22, 2019).

**III.**

**Elective Share of Estate**

The Orphans' Court concluded that the evidence supported a finding that Emeline procured her marriage to the Decedent by undue influence. It ruled that Emeline was not entitled to claim her elective share of the Estate because, by operation of Fla. Stat., section 732.805(1)(a), "a surviving spouse who is found to have procured a marriage to the decedent by fraud, duress, or undue influence is not entitled to . . . [a]ny rights or benefits under the Florida Probate Code, including, but not limited to, *entitlement to elective share* or family allowance . . . ."

Emeline does not challenge the finding of undue influence, but she argues that because the Orphans' Court found that the Decedent was domiciled in Maryland at the time of his death, Maryland probate law governed her entitlement to an elective share of the Estate, not Florida probate law. Further, she maintains that the Orphans' Court lacks the authority to invalidate her marriage to the Decedent "based on the voidable ground of undue influence."

Shannon responds that the Orphans' Court correctly applied Florida law under the doctrines of *lex loci contractus* and/or *lex loci celebrationis* because Emeline and the Decedent were married in Florida. In the alternative, she maintains that "to the extent Florida law does not apply, any error . . . was harmless because Maryland's well

-19-

established common law doctrine of unclean hands prohibited [Emeline] from receiving the spousal share" considering the unchallenged factual finding that the marriage was procured by undue influence.

We agree with Emeline that the Florida statute was inapplicable. The provision of the Florida Probate Code governing a surviving spouse's entitlement to an elective share states, in relevant part: "The surviving spouse *of a person who dies domiciled in Florida* has the right to a share of the elective estate of the decedent as provided in this part, to be designated the elective share." Fla. Stat. § 732.201 (emphasis added). The Orphans' Court found that the Decedent was domiciled in Maryland when he died, a ruling that Emeline no longer challenges and which we affirm. It follows that Fla. Stat. section 732.805(1)(a), which, by its express terms, only affects "rights and benefits" flowing from the Florida Probate Code, was not implicated here because Emeline, as the surviving spouse of a non-domiciliary, had no right to an elective share under the Florida Probate Code.[10] Thus, Emeline's entitlement, *vel non*, to an elective share of the Estate flows from Maryland law. Specifically, ET section 3-203(b) permits a surviving spouse to elect to "take a one-third share of the net estate if there is also a surviving issue . . . ."

---

[10] It is clear under Maryland law that, by application of the doctrine of *lex loci celebrationis,* Florida law would govern issues going to the validity of the marriage contract between Emeline and the Decedent. *See Port v. Cowan*, 426 Md. 435, 446-47 (2012) ("When considering a foreign marriage specifically, Maryland courts follow the choice-of-law rule of *lex loci celebrationis*, applying the substantive law of the place where the contract of marriage was formed." (citing *Jackson v. Jackson*, 82 Md. 17, 28 (1895))). As already discussed, the validity of the marriage was not before the Orphans' Court.

Because Emeline legally married the Decedent, was not divorced from him, and did not have her marriage to him annulled, she was a surviving spouse and could elect the statutory one-third share. *See* ET § 1-202 (defining "surviving spouse").

While the Florida statute is inapplicable, we may nevertheless affirm the Orphans' Court's ruling on any ground adequately shown by the record and which was raised below. The Florida statute, by barring a surviving spouse from receiving a benefit from the estate of a deceased spouse if he or she procured the marriage to the spouse through inequitable conduct, essentially codifies the well-established common law doctrine of unclean hands, recognized by Maryland. The doctrine of unclean hands was argued before the Orphans' Court. That doctrine "'refuses recognition and relief from the court to those guilty of unlawful or inequitable conduct pertaining to the matter in which relief is sought.'" *Hicks v. Gilbert*, 135 Md. App. 394, 400 (2000) (quoting *Manown v. Adams*, 89 Md. App. 503, 511 (1991)). The doctrine "is not applied for the protection of the parties nor as a punishment to the wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct." *Adams v. Manown*, 328 Md. 463, 474-75 (1992). For that reason, "an important element of the clean hands doctrine is that the alleged misconduct must be connected with the transaction upon which the claimant seeks relief." *Id*. at 475. In other words, "[i]t is only when [a party's] improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this conduct. 'What is material is not that the [party's] hands are dirty, but that he dirties them in acquiring the right he now asserts.'" *Id*. at 476 (quoting D. Dobbs, *Remedies* § 2.4 at 46 (1973) (footnote omitted)).

While our research reveals no Maryland cases applying the doctrine of unclean hands under similar facts to those before us, at least one sister court has held that a person who "procured [a] marriage . . . through overreaching and undue influence" "forfeited any rights that would flow from the marital relationship, including the statutory right she would otherwise have to an elective share of [her deceased spouse's] estate." *Campbell v. Thomas*, 897 N.Y.S.2d 460, 471 (N.Y. App. Div. 2010). The *Campbell* Court reasoned that just as "overreaching and undue influence" may bar a person from recovering under a will, a person who procures a marriage by that same conduct for pecuniary gain should not be allowed to benefit from it. *Id.* Under those circumstances, the court concluded that "equity will intervene to prevent the unjust enrichment of the wrongdoer" and to "prevent [the court] and [its] processes from being affirmatively employed in the execution of a wrongful scheme." *Id*. at 472.

We return to the case at bar. The Orphans' Court found that Emeline exercised undue influence over the Decedent to cause him to marry her for her financial gain. Had Emeline engaged in this same conduct to cause the Decedent to change his Will to her advantage, the Will could have been set aside on that basis. *See, e.g., Green v. McClintock*, 218 Md. App. 336, 338-72, 374 (2014) (affirming decision to set aside a will executed in favor of the decedent's brother based upon a finding that brother exercised undue influence). There is a clear nexus between Emeline's "improper conduct" and her claim before the Orphans' Court to a statutory share of the Estate. We are persuaded, for same reasons identified in *Campbell,* that Emeline's inequitable conduct in achieving her

status as a surviving spouse bars her from making a claim before the Orphans' Court for a

a statutory share of the Estate.  The Orphans' Court did not err by so ruling.

**ORDER OF THE ORPHANS' COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.  COSTS TO BE PAID BY THE APPELLANT.**